977 F.2d 587
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
CONTINENTAL INSURANCE COMPANY, a foreign corporation;
Marine Office of America Corporation, a foreign
corporation, Plaintiffs-Appellants,
v.
URSIN SEAFOODS, INC., a foreign corporation; NORMAN URSIN,
SR., an individual, Defendants-Appellees.
 No. 92-35023.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 18, 1992.
Decided Oct. 6, 1992.
 
 Before FLETCHER, BEEZER and LEAVY, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 We consider an insurer's duty to pay an otherwise covered loss in the face of allegations that the insured committed fraud. The district court held that no fraud occurred and that the unreasonable investigation by Continental Insurance Company and Marine Office of America Corporation (collectively Continental), which resulted in denial of Ursin Seafoods, Inc.'s (Seafoods') claim, constituted bad faith. The district court awarded Seafoods substantial lost profits and attorney fees. Continental appeals, arguing that the district court clearly erred in its findings of fact and that the district court did not address the issue of Seafoods' duty to mitigate. Continental also challenges the district court's measurement of damages and attorney fees. We affirm the district court's judgment on liability and its award of damages. We vacate the district court's award of attorney fees and remand for a redetermination of attorney fees in accordance with Alaska law.
 
 
 3
 * Norman Ursin, Sr. (Ursin) owns Seafoods, which operates a fish processing plant in Kodiak, Alaska. One side of the property on which Seafoods' plant is built abuts Kodiak's harbor. A seawall separated the harbor from and provided retaining support for the ground upon which Seafoods built its plant. The circumstances surrounding the seawall's failure and damage to Seafoods' plant provide the factual backdrop for this case.
 
 
 4
 Effective May 31, 1989, Continental insured Seafoods for property damage and business interruption.[1] On August 25, 1989, Equifax employee Frank Lucente inspected Seafoods' property on Continental's behalf and reported it to be in satisfactory condition. He either did not inspect or found no problem with the seawall behind Seafoods' Pier 1 building.
 
 
 5
 On October 26, 1989, Seafoods' broker submitted a claim to Continental for damage to the Pier 1 building and the seawall behind it. The claim alleged that most of the damage had occurred due to a September 19, 1989 storm. Subsequent storms exacerbated the damage.
 
 
 6
 Initially Continental treated Seafoods' claim as though it would be partially covered. It changed its assessment of the legitimacy of the claim, however, upon receiving a fax from Norman Ursin, Jr. ("Junior") on March 8, 1990. The fax alleged fraud in the insurance claim due to preexisting defects in the seawall.
 
 
 7
 Continental then undertook a fraud investigation. Richard Stanton, employed by Continental's fraud unit, interviewed Junior, Rolando Calibo, a former plant employee, and Barry Still, a contractor who had bid on replacing the seawall. On April 17, 1990, Stanton recommended denial of Seafoods' claim. Stanton did not interview four people that Junior's fax identified as having knowledge about the seawall's preexisting defects. Pursuant to a term in the policy, Continental had Ursin submit to questioning under oath on May 14, 1990. Ursin maintained that the plant and seawall were in good condition before the storm. Continental denied Seafoods' claim on May 29, 1990, and filed this declaratory judgment action on the same day. Seafoods counterclaimed.
 
 
 8
 The district court held a bench trial in which 2869 pages of testimony were taken and more than 5000 pages of documentary exhibits were admitted. The district court found that no fraud had occurred and that Continental's bad faith handling of Seafoods' claim caused significant contract and tort damages. The district court entered judgment in Seafoods' favor and awarded Seafoods $4,134,985.53. Amended Judgment, No. C90-762C, at 2 (W.D.Wash. Dec. 2, 1991) (listing components). The award includes prejudgment interest and attorney fees.
 
 
 9
 Following a trial on the merits, we review questions of law de novo and questions of fact for clear error. We take a functional approach toward review of most mixed questions, reviewing findings of historical fact for clear error and the application of the law to those facts de novo. We review certain fact-intensive mixed questions, such as negligence, for clear error. United States v. McConney, 728 F.2d 1195, 1200-04 (9th Cir.) (en banc), cert. denied, 469 U.S. 824 (1984).
 
 II
 
 10
 Washington and Alaska are the two states whose substantive law might apply to this case. We apply the choice of law rules of the state in which the district court is located to determine which state's substantive law governs. Alaska Airlines v. United Airlines, 902 F.2d 1400, 1402 (9th Cir.1990) (de novo review of district court's decision on choice of law), appeal dismissed due to settlement, 932 F.2d 1571 (9th Cir.1991).
 
 
 11
 Washington adheres to the Restatement (Second) of Conflict of Laws "most significant relationship" test for choice of law questions. This test eschews rote addition of factors and contemplates applying the law of the state whose contacts with the dispute are the most significant, not necessarily the most numerous. Johnson v. Spider Staging Corp., 555 P.2d 997, 1000-01 (Wash.1976) (torts); Baffin Land Corp. v. Monticello Motor Inn, 425 P.2d 623, 627-28 (Wash.1967) (contracts). If both states have significant contacts, then a court must consider which state's policies are more important to vindicate. Johnson, 555 P.2d at 1001-02.
 
 
 12
 The district court awarded damages to Seafoods under both contract and tort theories. The Restatement lists the contacts to consider for both types of actions.[2] The Restatement also specifically addresses insurance contracts, presuming to determine "the rights created thereby [under] the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy." Restatement (Second) of Conflict of Laws § 193 (1971). Following Restatement principles, the Washington Court of Appeals applied Idaho law to an Idaho insured's coverage dispute, which arose out of a Washington automobile accident, because "the principal location of the risk and the cost of the policy were presumably established according to Idaho law." Dairyland Ins. Co. v. State Farm Mut. Ins. Co., 701 P.2d 806, 809 (Wash.Ct.App.), review denied, 104 Wash.2d 1016 (1985).
 
 
 13
 With respect to Seafoods' contract claims, we conclude that the location of the insured risk should control. The property damaged was in Alaska, and the business that was interrupted was in Alaska. With respect to Seafoods' tort theories, we think it appropriate in these circumstances to give primary emphasis to the place where the parties' relationship is centered because Continental's tortious conduct flows from its preexisting relationship with Seafoods. The parties' relationship is centered around the insured risk. Accordingly, we hold that Alaska law applies to this case.
 
 III
 
 14
 Continental's policy voids property coverage
 
 
 15
 in any case of fraud by you at any time as it relates to this Coverage Part [ (Commercial Property) ]. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact....
 
 
 16
 Commercial Property Conditions p A. The business interruption coverage part provides coverage only in the event of a covered property loss. Business Property Business Income Coverage Form p A.2.
 
 
 17
 Alaska law allows an insurer to void coverage in the event of material false or fraudulent swearing by the insured for the purpose of deceiving the insurer. See Dairy Queen v. Travelers Indem. Co. of Am., 748 P.2d 1169, 1170 & nn. 2, 3 (Alaska 1988) (also indicating that fraud or false swearing is a jury question); see also 13A Ronald A. Anderson, Couch Cyclopedia of Insurance Law § 49A:63, at 577 (2d ed. 1982).[3] We review the district court's finding on the ultimate issue of fraud for clear error. Northwest Acceptance Corp. v. Lynnwood Equip., 841 F.2d 918, 922 (9th Cir.1988).
 
 
 18
 On appeal of the misrepresentation issue, Continental attacks two of the district court's findings of fact. First, that "[n]o one ordered, authorized, conspired to commit, or committed any act of fraud or any act which would have concealed old damage or made old damage appear new, at any time." Findings of Fact and Conclusions of Law, No. C90-762C, at 3, finding 7 (W.D.Wash. Oct. 24, 1991). Second, that "[w]hen Norman Ursin, Sr. gave a sworn statement in May of 1990 he truthfully described his recollections of the condition of the plant and seawall as they existed prior to the insured loss in September and October of 1989." Id. at 4, finding 10.
 
 
 19
 In its briefing, Continental expends considerable effort setting forth evidence supporting a proposition that the district court explicitly acknowledged in its bench ruling--namely that the plant had preexisting problems. Transcript of Bench Ruling, No. C90-762C, at 4 (W.D.Wash. Sept. 18, 1991). The fact that both the storm and preexisting defects might have caused the damage, however, did not void coverage under Continental's policy. In fact, this mixture of causation is precisely the reason why Continental hired Bob Love, an Anchorage claims adjuster, and Avery Miller, an engineer who examined the excavated seawall tieback system. See 6 John A. Appleman & Jean Appleman, Insurance Law and Practice § 3971 (rev. ed. 1972) (overview of the adjustment process). Even after Avery Miller reported on February 3, 1990, that preexisting defects in the tieback system helped cause the seawall failure, Continental continued to treat Seafoods' claim as a covered loss subject to adjustment.
 
 
 20
 The issue thus narrows to whether the district court clearly erred by finding that neither Ursin nor Seafoods' authorized agents made material misstatements with the intent to deceive Continental. As an initial matter, Continental fails to undermine three key credibility determinations made by the district court. See Transcript of Bench Ruling, at 3-4 (Love a credible witness who thought damage was new and Junior held a grudge); Findings, at 4, finding 10 (Ursin gave a truthful recollection in his May 14, 1990 sworn statement); Findings, at 3, finding 6 (any reasonable investigator would have had serious reservations about Junior's credibility). See generally Transcript of Bench Ruling, at 4-5 (substantial bias and credibility concerns about testimony suggesting fraud). These credibility determinations are mutually reinforcing, and we pay special deference to a trial court's credibility findings. Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985).
 
 
 21
 Unable to attack the district court's credibility determinations directly, Continental relies upon a July 1, 1988 photograph, and the accompanying "pipe story." Realistically, though, this piece of evidence affords mixed inferences at best. Although the photograph does appear to show an extender protruding from the end of the black pipe, it also appears to show that the seawall is straight. One final fact that weighs heavily against Continental is that its own inspector detected no patent problems during his August 25, 1989 inspection of Seafoods' plant in Kodiak, Transcript of Bench Ruling, at 3; Findings, at 4, finding 9, even though according to Continental problems with both the plant and the seawall were manifest by that date.
 
 
 22
 We conclude that the district court did not clearly err when it found that neither Ursin nor Seafoods committed fraud, misrepresentation or false swearing during the claims submission process. Absent such deceit, Continental failed to pay a covered claim, resulting in liability on the contract.
 
 IV
 
 23
 The district court found that Continental's failure to conduct a reasonable investigation constitutes bad faith. Findings, at 2, finding 3, at 5, finding 12. It further found that Continental's breach of the duty of good faith and fair dealing sounds in tort. See Findings, at 6, finding 18 (Seafoods suffers damages in addition to those suffered pursuant to contract). Continental argues that its conduct did not constitute bad faith and that it conducted a reasonable investigation.
 
 
 24
 That an insurer owes its insured a duty of good faith and fair dealing is universally accepted. Because it is a duty imposed by law, not by contract, breach results in tort liability. Alaska Pac. Assurance Co. v. Collins, 794 P.2d 936, 946 (Alaska 1990).
 
 
 25
 Continental contends that Alaska requires more than bad judgment or negligence to support a finding of bad faith. State Farm Fire & Casualty Co. v. Nicholson, 777 P.2d 1152, 1154 n. 3 (Alaska 1989). Continental implies that a merely unreasonable investigation (i.e., negligence) will not support tort liability. Alaska law does hold that negligent breach of a contract duty does not produce tort liability. Negligent breach of a legal duty, however, produces tort liability. Collins, 794 P.2d at 946. Part of the insurer's duty of good faith and fair dealing in the third-party context is "to investigate claims and to inform the insured of all settlement offers." O.K. Lumber Co. v. Providence Wash. Ins. Co., 759 P.2d 523, 525 (Alaska 1988). We see no reason why Alaska would not extend this legal duty to the first-party context. See Nicholson, 777 P.2d at 1154-57 (generally extending the duty of good faith and fair dealing to the first-party context); see also Industrial Indem. Co. v. Kallevig, 792 P.2d 520, 526 (Wash.1990) (explicitly holding that failure to make a reasonable investigation constitutes bad faith because any resulting denial of a claim must be based on suspicion and conjecture). We hold that Alaska law requires that an insurer make a reasonable investigation before denying a claim, else it acts in bad faith.
 
 
 26
 Alaska law submits the question of an insurer's bad faith to the jury. Collins, 794 P.2d at 947. We review a determination on the ultimate issue of bad faith for clear error. Hanson v. Prudential Ins. Co. of Am., 783 F.2d 762, 766 n. 1 (9th Cir.1985).
 
 
 27
 In trying to defend its investigation, Continental's first feint, once again, is to prove that which the district court specifically acknowledged--that there was preexisting damage. But that is not the issue. Continental must defend that it reasonably investigated the alleged fraud. It did not interview the four people Junior identified in his fax as having knowledge of the fraud, and specifically did not interview Rehmer, identified by claims adjuster Love as the key to the investigation. Continental advances no reason why it should have found Junior credible and no credible reason why it should have disbelieved Ursin when he gave his sworn statement. See Transcript of Bench Ruling, at 6 ("I can't end this without observing how unfortunate it is that all of the work that we went through in this case wasn't done or a substantial amount of it wasn't done before somebody decided to deny this claim.").
 
 
 28
 We conclude that the district court did not clearly err when it found that Continental acted in bad faith by not conducting a reasonable investigation. Breach of the legal duty of good faith and fair dealing exposes Continental to tort damages.
 
 V
 
 29
 Continental argues that the district court erred by not making findings on Seafoods' duty to mitigate. The district court's findings essentially address only causation. See Findings, at 5-7, findings 12-19. Continental points out that it even proposed findings of fact on mitigation. Continental, Plaintiffs' Proposed Supplemental Findings of Fact and Conclusions of Law, No. C90-762C, at 4-5, finding 10 (W.D.Wash. Oct. 2, 1991). The district court's rejection of Continental's proposed findings cuts both ways, of course, as it implies that the district court felt Continental did not meet its burden of showing a duty to mitigate.
 
 
 30
 The party alleging a failure to mitigate bears the burden of showing that the damaged party failed to make reasonable efforts or reasonable expenditures to mitigate its damages. West v. Whitney-Fidalgo Seafoods, 628 P.2d 10, 18 (Alaska 1981) (duty to mitigate does not extend to undue risk or expense; court will consider damaged party's financial capacity); University of Alaska v. Chauvin, 521 P.2d 1234, 1240 (Alaska 1974) (injurer has burden of showing damaged party's failure to mitigate). Absent a specific finding on mitigation, we may affirm on any ground finding support in the record. Marino v. Vasquez, 812 F.2d 499, 508 (9th Cir.1987).
 
 
 31
 Continental contends that Seafoods should have considered repairing only the 34 to 36 feet of the seawall damaged by the storm. It seems unreasonable to require such a band-aid repair that would expose Seafoods to more substantial risk in the future. In addition, far more extensive damage had occurred. Continental's own hired investigators (Love and Miller) agreed that the Pier 1 building had to be demolished. An excavation was performed to determine the reasons for the tieback failure. It seems reasonable that Seafoods would combine the insurance proceeds with additional funds of its own to rebuild a sturdier structure.[4]
 
 
 32
 To that end, Seafoods sought to construct a new 160-foot seawall. By April of 1990 it had completed construction of that seawall at its own expense.[5] The district court found that 60 feet of the seawall was a betterment, so it denied recovery for that portion. The covered cost of seawall reconstruction was $166,721, see Transcript of Bench Ruling, at 5, well in excess of the $90,000 of its own money that the policy obligated Seafoods to spend.[6] We think this seawall reconstruction was a reasonable first step in reconstructing the plant.
 
 
 33
 Seafoods obviously began to experience severe financial pressures. By November 7, 1990, Continental's refusal to pay caused Seafoods to have to sell its Baader fish processing machines at a loss. Findings, at 6, finding 17. Seafoods began mitigation by reconstructing the seawall, and then found it had inadequate financial resources to continue the work. We conclude that Seafoods made reasonable efforts to mitigate its damages.
 
 VI
 
 34
 Continental excoriates the district court's award of lost profits, arguing that the award is speculative and unsupported by the evidence. Both parties confuse the facts in their arguments, however, and do not focus on how the district court arrived at the award.
 
 
 35
 There is one other thing that I want you to both give some thought to, and I am speaking off the top of my head now and not for appellate review purposes. But I have often said that we don't deal here with scalpels. We deal with meat axes a lot of times when we are trying to approximate monetary award measures. I am not particularly comfortable with Mr. Hughes' analysis, not because I think it is an unsound analysis nor because I think it is not entitled to careful consideration, but more because I am inclined to look at pattern of earnings in the past as a better projector of earnings in the future.
 
 
 36
 Transcript of Proceedings, at 1055-56.
 
 
 37
 The most important aspect of this statement is the district court's certainty that Seafoods suffered lost profits. See also Findings, at 6-7, findings 18-19. Such an affirmative statement on the existence of lost profits constitutes a clear finding that lost profits were not speculative. See Guard v. P & R Enters., 631 P.2d 1068, 1071 (Alaska 1981). Given Seafoods' long track record of success in the fish processing industry, we agree that it was not speculation that, absent Continental's wrongful conduct, Seafoods would have continued to earn profits.
 
 
 38
 To measure lost profits, the district court determined Seafoods' average annual earnings from 1984 through 1988. It then awarded Seafoods damages in an amount sufficient to eliminate Seafoods' 1990 loss and to replace that loss with Seafoods' historical average annual earnings. It awarded the same damages for 1991. The district court found that the higher damages proposed by Seafoods' expert corroborated the method it used. Findings, at 7, finding 19.
 
 
 39
 Alaska law allows a trial court to consider a variety of factors in quantifying lost profits. Guard, 631 P.2d at 1072 (past profits of established business; profit history from injured party's similar business; profit history of business prior to injured party's ownership). The damages determined need only be reasonably certain, even for a completely new business. Id. A lost profits award must balance two competing policy goals: prevent windfalls to wrongdoers simply because damages cannot be proved with absolute certainty, but guard against requiring wrongdoers to become profit guarantors. See id. at 1072-73.
 
 
 40
 We think the district court took a reasonable approach in quantifying Seafoods' lost profits. It acknowledged Seafoods' sophisticated market-based projections, but felt more comfortable relying on Seafoods' past performance. The district court's award is supported by evidence in the record, and is not "grossly excessive, monstrous, or shocking to the conscience." Stinnett v. Damson Oil Corp., 813 F.2d 1394, 1398 (9th Cir.1987). As we stated earlier, the question is not whether Seafoods would have earned profits, but the amount of profits Seafoods would have earned. The district court has required only that Continental compensate Seafoods, not that Continental guarantee Seafoods' profits.
 
 
 41
 Alaska denies prejudgment interest only where it would constitute a double recovery. Nicholson, 777 P.2d at 1158. The district court awarded prejudgment interest accordingly. We affirm the district court's award of compensatory damages in all respects.
 
 VII
 
 42
 The district court awarded Seafoods its full attorney fees in this case. Seafoods' first attorney represented it on an hourly basis until Seafoods could no longer pay his bills, and Seafoods' second attorney took the case on a contingency basis. Findings, at 7-8, finding 20. Continental does not dispute Seafoods' entitlement to some attorney fees; it merely objects to the amount awarded. We review an award of attorney fees for abuse of discretion. Bouman v. Block, 940 F.2d 1211 (9th Cir.), cert. denied, 112 S.Ct. 640 (1991); see also O.K. Lumber, 759 P.2d at 528 (same in Alaska).
 
 
 43
 Alaska partially compensates for attorney fees. Atlantic Richfield Co. v. State, 723 P.2d 1249, 1252 (Alaska 1986). Complexity alone does not justify an award of full fees, and attorney fees may not be used to penalize a party. Id. A trial court awards attorney fees pursuant to Alaska Rule of Civil Procedure 82 unless some other specific basis for an award applies. Collins, 794 P.2d at 949. When fees are not based on the schedule in Alaska Rule of Civil Procedure 82(a)(1), a trial court abuses its discretion if it compensates excessive attorney hours or awards an overly high percentage of an otherwise reasonable fee.[7] O.K. Lumber, 759 P.2d at 528; see Dahle v. Atlantic Richfield Co., 725 P.2d 1069, 1074-75 (Alaska 1986) (awarding partial fees and listing other cases doing the same); see also Van Huff v. Sohio Alaska Petroleum Co., 1992 Alas. LEXIS 71, at (Alaska June 26, 1992) (partial fees).
 
 
 44
 In certain circumstances, an award of the full reasonable fee is permitted. Anchorage Daily News v. Anchorage School Dist., 803 P.2d 402, 404 (Alaska 1990) (public interest litigant pursuing matter not likely to result in significant financial gain). Generally, however, "[a]bsent bad faith or vexatious conduct by the losing party, an award of full attorney's fees is manifestly unreasonable, and it constitutes an abuse of discretion." Atlantic Richfield co. v. State, 723 P.2d at 1252. The bad faith or vexatious conduct must occur in the litigation. Davis v. Hallett, 587 P.2d 1170, 1171 (Alaska 1978), disapproved on narrow other grounds, Atlantic Richfield Co. v. State, 723 P.2d at 1252 & n.4; see Van Dort v. Culliton, 797 P.2d 642, 645 (Alaska 1990) (conduct in settlement negotiations not a proper factor to consider in assessing a litigant's bad faith).
 
 
 45
 The district court made no finding that Continental engaged in bad faith or vexatious conduct in the litigation. We see no evidence of any such conduct. Seafoods clearly is not a public interest litigant. The district court did find that Seafoods' actual attorney fees were reasonable. It then concluded:
 
 
 46
 In view of the fact that punitive damages are not being awarded, the court finds that the plaintiffs should pay defendants' actual, reasonable attorney's fees and costs so that defendants are fully compensated for the damages caused by plaintiffs' wrongful conduct and so that compensatory damages do not have to be used to pay the expenses of defending and pursuing this case.
 
 
 47
 Findings, at 8, finding 20. Based on Alaska's policy of awarding only partial attorney fees, and its policy that such awards not be punitive, we conclude that the district court abused its discretion here when it awarded full reasonable attorney fees and not a percentage thereof.
 
 
 48
 We vacate the district court's award of attorney fees and remand for a redetermination. The district court should award fees either pursuant to the schedule in Rule 82(a)(1) or, in its discretion, based upon a percentage of Seafoods' reasonable actual fees that is not overly high.
 
 
 49
 We also award Seafoods its attorney fees on appeal. Alaska R.App.P. 508(e). On remand, the district court shall determine the amount of the award for trial and for appeal.
 
 
 50
 No appeal was taken from the district court's failure to award punitive damages. We decline Seafoods' request that we require the district court to amend the judgment for continuing damages.[8]
 
 VIII
 
 51
 The district court's judgment on liability and its award of compensatory damages are AFFIRMED. Seafoods is entitled to costs and attorney fees on appeal. The award of attorney fees is VACATED AND REMANDED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Cir.R. 36-3
 
 
 [1]
 At all times Seafoods insured its property, although not always with the same carrier
 
 
 [2]
 For contracts:
 (a) the place of contracting,
 (b) the place of negotiation of the contract,
 (c) the place of performance,
 (d) the location of the subject matter of the contract, and
 (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
 These contacts are to be evaluated according to their relative importance with respect to the particular issue.
 Restatement (Second) of Conflict of Laws § 188(2) (1971). As to torts:
 (a) the place where the injury occurred,
 (b) the place where the conduct causing the injury occurred,
 (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
 (d) the place where the relationship, if any, between the parties is centered.
 These contacts are to be evaluated according to their relative importance with respect to the particular issue.
 Id. § 145(2).
 
 
 [3]
 "In order to constitute fraud in a proof of loss so as to relieve the insurer from liability on the policy, it is necessary that the statement relate to a material fact and that the person in question act with the specific intent to defraud or deceive the insurer."
 
 
 [4]
 Continental admits that the Pier 1 building suffered the majority of its damage by virtue of the storms. Continental, Proposed Findings, at 3, finding 6
 
 
 [5]
 The district court found that funds for the seawall construction were due and owing as of May 31, 1990. Findings, at 6, finding 15
 
 
 [6]
 Even the April 1988 quote of $118,000 to upgrade the seawall, prior to storm damage, would have exhausted the $90,000. See Continental's Opening Brief 12-13
 
 
 [7]
 This "reasonable fee" is, for all intent and purpose, the lodestar
 
 
 [8]
 Seafoods requests continuing damages to compensate for the losses it continues to suffer because it has not yet been able to fund reconstruction of its plant. We agree that Seafoods is entitled to compensation for its ongoing losses due to Continental's conduct. However, since postjudgment interest on the district court's damage award appears to adequately compensate Seafoods for any continuing losses during the postjudgment period, we decline the request